UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.14-cv-20906-UU

MATHIEU LEVY,

    Plaintiff,

v.

REMY COINTREAU USA, INC.,

    Defendant.

_____/

## ORDER

THIS CAUSE comes before the Court upon Cross-Motions for Summary Judgment. (D.E. 28 and 34).

THE COURT has considered the motions and the pertinent portions of the record, and is otherwise fully advised in the premises. The motions have been fully briefed and are ripe for determination.

## BACKGROUND

The following facts are not in dispute unless otherwise indicated: From January 17, 2012, to December 11, 2013, Mathieu Levy was employed by Remy Cointreau USA, Inc. ("Remy"), which is the United States subsidiary of a company that produces various alcoholic beverages. Levy Dep., 74:2–4, 178:16–21; Dankenbrink Decl., ¶ 3. Remy imports the spirits produced by its parent company and sells them to distributors, who in turn sell them to "on premise" accounts (e.g. bars and restaurants) and "off premise" accounts (e.g. liquor stores). De Launay Dep., 11:19–12:12, 17:12–18. Remy does not sell directly to any accounts or individuals, and is prohibited by law from doing so. *Id.* at 11:19–12:7. Similarly, the distributors are prohibited from

selling directly to individual consumers, and must instead sell only to accounts. *Id.* at 11:19–24.

Remy employs region-specific brand ambassadors to promote its products. Levy, who has a masters degree in marketing and international management, was employed by Remy as the exclusive brand ambassador for Louis XIII, a premium cognac sold for $2,700 per bottle, for a region consisting of Florida, Georgia, Alabama, Louisiana, Texas, Tennessee and Colorado.[1] Levy Dep., 20:20–23, 64:14–17, 74:5–75:25, 81:22–82:2; de Launay Dep., 16:7–14. As part of his application process, Levy interviewed with several Remy employees, including the President and Chief Executive Officer, and was required to prepare and deliver to Remy's marketing team a fifteen-minute presentation on Louis XIII cognac. Levy Dep., 74:5–75:25. As brand ambassador, Levy formed part of Remy's marketing division; he reported directly to Yves de Launay, Remy's Vice President of Prestige Brands, who in turn reported directly to Remy's Chief Marketing Officer. De Launay Dep., 5:20–21, 7:5–7, 8:23–9:11.

Generally put, Levy was tasked with promoting Louis XIII cognac with businesses and high net worth individuals in his market. *Id.* at 16:15–18:20. To promote the product with businesses, Levy focused on developing relationships with the seventy-five most important accounts, as determined by him, in each of the seven states in his region. *Id.* at 16:17–18:20. Levy would form relationships with management and ownership of those accounts, and would similarly form such relationships with management and ownership of potential accounts to convince them to offer Louis XIII cognac. Dankenbrink Dep., 38:10–25. He educated both distributors and accounts about the history of Remy and the distinguishing characteristics of

---

[1] Levy also proffers evidence that he was the brand ambassador for certain Remy champagne brands. Levy Aff., ¶ 1.

Louis XIII cognac, and trained staff as to how to sell, serve and consume the spirit. *Id.* at 35:13–36:4, 36:17–25, 38:10–39:17, 41:25–42:10; Levy Dep., 30:20–31:8, Exhibit 2; Levy Decl., ¶¶ 13, 14, 19, 20; Levy Aff., ¶ 12. Additionally, Levy was tasked with improving brand visibility by securing premium display of the spirit and delivering and assembling product displays and promotional materials. *Id.* With regards to training, educating and securing brand visibility, Levy was expected to follow Remy's guidelines. Dankenbrink Dep., 42:15–19, 44:10–16. Levy also promoted sales by developing customized promotional consumer programs to drive sales. Levy Dep., 30:20–31:8, 99:17–19, 108:13–16, 147:4–20, Exhibit 2.

To promote the spirit with high net worth individuals, Levy was tasked with developing and maintaining relationships with wealthy and connected individuals and with educating those individuals about the distinguishing characteristics of Louis XIII cognac. Dankenbrink Dep., 35:24–36:4, 36:17–37:2, 39:18–23, 40:2–8, 41:5–9; Levy Dep., 30:20–31:8, Exhibit 2. Levy sought out high net worth individuals by attending events he thought would attract wealthy guests and by meeting with "connected" individuals, such lawyers, doctors, executives and even the director of a private club. Levy Dep., 192:10–21, 234:16–241:6. Though Levy identified specific networking events to attend, his attendance was subject to the approval of his supervisor, de Launay; on occasion, de Launay rejected certain events, instructing Levy to abstain from attending. *Id.* at 246:7–17.

Lastly, to promote the product more generally, Levy would organize and host events, such as tastings, dinners and parties. Dankenbrink Dep., 53:14–19, Levy Aff., ¶ 15–17. Certain of the approximately 130 events he organized were produced jointly with other luxury brands. Levy Dep., 30:20–31:8, 253:6–11, Exhibit 2. Although ultimately subject to Remy's approval, Levy

would often select the venue and vendors for his events, and would negotiate and enter into contracts on behalf of Remy. *Id.* at 86:16–88:18, 90:13–91:7, 134:23–135:21, 162:10–163:11, 239:1–16, 254:6–18; Levy Suppl. Aff., Exhibit 10. Additionally, Levy would personally undertake much, if not all, of the manual work required to set up his events, which included preparing the rooms, bringing various items (including decorations, sales materials, displays and wine) and returning the rooms to their prior condition. Levy Decl., ¶¶ 13, 14, 19, 20; Levy Dep., 43:12–17; Levy Aff., ¶ 19. As host, Levy was also responsible for welcoming and entertaining guests, giving a scripted presentation on Louis XIII cognac and conducting a tasting of the spirit. Levy Dep., 43:12–17; Levy Aff., ¶ 21.

While every event was different, Levy was expected to comport with Remy's event experience guidelines, which related to many subjects, including the size and feel of the party, the type of venue, the menu, topics of discussion and decor. Dankenbrink Dep., 44:22–45:3; Levy Dep., 85:21–24; Levy Aff., ¶ 17, Exhibit A. However, the guidelines did not cover all aspects of the events, and there was also some flexibility within the guidelines, which often offered a range of options. Levy Dep., 86:5–8, 201:20–202:25, Exhibit 3. Further, Levy often sought and obtained approval to deviate from Remy's guidelines. *Id.* at 85:25–86:4, Dankenbrink Dep., 45:4–25, 53:7–12; Levy Suppl. Aff., ¶¶ 2, 3.

To pay for these events, and for other expenses incurred in promoting Louis XIII cognac, Levy used a company credit card. Levy Dep., 123:6–16, Exhibits 34–36. He had an annual travel and personal expense budget of about $20,000 and an activation budget, which was used for miscellaneous non-event based promotions, of about $10,000 to $15,000. *Id.* at 128:11–129:4. Additionally, Remy afforded Levy a budget of about $5,000 per dinner event and about $2,000

per cocktail reception, though Levy on occasion and with permission from his supervisor exceeded those budgets. *Id.* at 127:17–128:15, 132:10–21. For example, with Remy's approval, Levy incurred charges of $8,301.30 and $9,637.28 in connection with two dinners with high net worth individuals. *Id.* at 230:18–235:21, Exhibits 36, 37.

Levy was not required to work at any particular hours and was free to work at his own pace so long as his tasks were completed. Dankenbrink Decl., ¶ 5. He did not keep track of his hours. *Id.* at 271:23–272–1, 274:10–13. Much of his time was spent driving or traveling to accounts or events in the seven states that comprise his region. Dankenbrink Dep., 41:13–18, 44:5–9; Levy Aff., ¶¶ 3, 12. And though he did not work in Remy's corporate office in New York, he spoke with his supervisor, the Vice President of Prestige Brands, regularly. Levy Dep., 269:6–17.

Levy's annualized salary was $90,000 from January 17, 2012, to June 30, 2013, and was $91,800 from July 1, 2013, until his termination on December 11, 2013. *Id.* at 67:6–11, 194:7–12, 310:7–12. Additionally, Levy participated in Remy's annual corporate bonus program. Under the program, the size of Levy's bonus was partially based on Remy's assessment of whether Levy met certain performance objectives, but mainly based on quantitative measures relating to Remy's performance in the prestige liquor market. *Id.* at Exhibits 4, 5, 19. Levy's bonus eligibility was contingent on his being employed at the date of payment and Remy reserved discretion to not pay any bonus. *Id.* at Exhibit 19. *Id.*

Levy received a bonus of $3,223 for his work from January 17, 2012, to March 31, 2012, and a bonus of $13,748 for his work from April 1, 2012, to March 31, 2013.[2] *Id.* at 153:4–15,

---

[2] Remy's fiscal year runs from April 1 to March 31. Dankenbrink Decl., ¶ 4.

193:19–194:6, Exhibits 18, 27. Thus, in total and allocating Levy's bonuses evenly over the period to which they are attributable, Levy earned over $100,000 for his work done in both 2012 and 2013 notwithstanding that he was not employed for the entirety of either of those years.

Levy filed suit on March 31, 2014, against Remy, alleging that Remy violated the overtime provision of the Fair Labor Standards Act ("FLSA") by failing to compensate Levy for overtime hours at a rate of pay-and-a-half. Remy now moves for summary judgment, and Levy moves for partial summary judgment.

## LEGAL STANDARD

Summary judgment is authorized only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the burden of proof, and when assessing whether the movant has met this burden, the court should view the evidence, any ambiguities therein and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–12 (5th Cir. 1967).

The party opposing summary judgment need not respond with evidence unless the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. However, the movant need not proffer evidence negating issues to which the opponent bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the motion is properly supported, the party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; instead, the nonmoving party must show that there exists some genuine

issue of essential fact. *Id.*; *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

If the record presents a genuine issue of material fact, the court must deny the motion. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981). This may be the case where the parties agree on the basic facts but disagree about the inferences that should be drawn from those facts, so long as both inferences are reasonable. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969); *Impossible Elecs. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine,' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## ANALYSIS

Remy argues that summary judgment is warranted because Levy's past employment is exempt from the overtime provision of the FLSA under the administrative employee exemption. Levy in contrast argues, *inter alia*, that the administrative employee exemption does not apply to his employment as a matter of law. The Court finds this issue dispositive.

The FLSA exempts from its overtime provision employees employed in a bona fide administrative capacity. 29 U.S.C. §§ 207(a)(1), 213(a)(1). An employee is employed in an administrative capacity if: (1) the employee is "compensated on a salary or fee basis not less than $455 per week"; (2) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a); *Viola*

*v. Comprehensive Health Mgmt., Inc.*, 441 F. App'x 660, 662 (11th Cir. Sept. 26, 2011). While both Remy and Levy agree that Levy worked on a salary basis and that his weekly compensation exceeded $455, they dispute whether Levy's employment meets the last two requirements of the exemption. As the employer, Remy bears the burden of proving the exemption applies. *Idaho Sheet Metal Workers, Inc. v. Wirtz,* 383 U.S. 190, 209 (1996).

An employee's "primary duty" is determined based on the character of the job as a whole and with reference to all relevant facts, which may include:

> "The relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."

*Id.* § 541.700(a). While the amount of time spent on exempt work is not necessarily dispositive, employees who spend more than half their time performing exempt work typically satisfy the primary duty requirement. *Id.* § 541.700(b). Here, the record evidence makes clear that Levy was primarily employed in an administrative capacity.

<u>Non-Manual Work Directly Related to the General Business Operations of Remy</u>

The administrative employee exemptions applies only as to employees whose "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a). Such work includes, but is not limited to, "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network,

internet and database administration; legal and regulatory compliance; and similar activities." *Id.* § 541.201(b). It does not include, for example, "working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* § 541.201(a).

Here, based on the record evidence, there can be no genuine dispute that Levy's primary duty constituted marketing and public relations. Levy's task was to represent Remy and Louis XIII cognac and to promote the brand in his assigned region, in which he had exclusive domain. To achieve this, he developed relationships with the most important accounts as determined by him, networked with and educated high net worth individuals and organized promotional events.

Levy disputes this contention, arguing that his primary role involved manual labor, such as delivering and installing displays and setting up rooms for presentations and events. But no reasonable person could conclude that Levy's primary duty was to undertake these menial tasks. Levy, who had a masters degree in marketing and who delivered a fifteen-minute presentation on Louis XIII cognac during his application process, was employed as "brand ambassador" and earned over $100,000 per year. Both the record and common sense support the notion that his primary task was to promote Remy and its spirits, not to serve as delivery man. Any manual work Levy undertook was directly related to his non-manual duties and merely facilitated the performance of his non-manual, promotional work. *See* 29 C.F.R. § 541.703(a) ("'[D]irectly and closely related' work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly.").

Additionally, Levy disputes that his primary duty was marketing, arguing that he was merely a salesman. Again, the record evidence tells otherwise. While Levy is correct in that his

conduct influenced Remy's sales indirectly, that effect is a byproduct, indeed the purpose, of marketing and public relations. A recent Eleventh Circuit opinion is illustrative. In *Viola v. Comprehensive Health Mgmt., Inc.*, the Court affirmed summary judgment for a health insurance provider that had contended a community outreach associate was an exempt administrative employee. FLSA. 441 F. App'x 660, 662 (11th Cir. Sept. 26, 2011). The employee was tasked with promoting her employer's product through networking, meeting with physicians and organizing and hosting promotional events. *Id.* at 662–63. In consideration of these facts, and notwithstanding that the plaintiff sought out new customers, the Court found as a matter of law that the plaintiff's primary duty was akin to marketing, public relations and advertising, and that her work therefore directly related to the general business operations of her employer. *Id.*

As did the plaintiff in *Viola*, Levy helped plan and implement strategies to promote his employer's brand. Not only did he identify and educate accounts and high net worth individuals in his region, but he also organized, produced and hosted approximately 130 promotional events. He was the exclusive brand ambassador within his region, and in that capacity acted as the face of Louis XIII cognac. *See id.* (noting that the plaintiff, whose employment required her to network and be active in the community, became the face of her employer in her market). As *Viola* makes clear, that Levy's promotional work induced the purchase of Remy spirits does not render him a salesman.[3] Instead, Levy, who worked within Remy's marketing department, primarily worked in marketing and public relations. As such, there is no genuine dispute that Levy's primary duty was the performance of non-manual work directly related to the general

---

[3] The Court reiterates that Remy does not sell any spirits directly to accounts or individuals, and instead sells only to distributors.

business operations of Remy.

<u>Discretion and Independent Judgment as to Matters of Significance</u>

The administrative employee exemption applies only as to employees whose "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R § 541.200(a). The exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." Whether an employee's primary duty includes the exercise of discretion and independent judgment depends on all relevant facts, including:

> "Whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances."

*Id.* § 541.202.

Here, Levy's primary duty plainly included the exercise of discretion and independent judgment with respect to matters of significance. In promoting Remy and Louis XIII cognac, Levy chose which accounts to target and had significant input as to how to reach and educate high net worth individuals in his region. Furthermore, he was instrumental in organizing and producing approximately 130 promotional events. For example, he assisted substantially with

choosing the venues and vendors, negotiating prices and entering into contracts on behalf of Remy. Additionally, Levy developed customized promotional consumer programs and hosted performance award ceremonies. He also provided Remy feedback concerning brand positioning, competitive activities and market trends in his region. To carry out his tasks, Remy afforded Levy substantial budgets, which Levy periodically exceeded with Remy's approval.

Levy argues that he did not exercise sufficient discretion because he was forced to work within company guidelines and often sought approval for decisions made within those guidelines.[4] The Court disagrees. Though the event experience guidelines limited Levy's discretion and independent judgment in organizing events, producing events was only one aspect of Levy's employment. Further, while Levy was tasked with following Remy's guidelines in planning promotional events, those guidelines afforded Levy considerable discretion in several respects. For example, the guidelines call broadly for an intimate feel as well as a venue that might "surprise" the guests, and caution the host to adapt the speech to the guests' profiles. Levy Dep., Exhibit 33. Lastly, even though the guidelines are exacting in certain respects, Levy often sought and received approval to deviate from the guidelines. As such, Levy's general adherence to Remy's event experience guidelines does not preclude his qualification as an administrative employee.

Similarly, that Levy often sought approval before acting does not control. Federal regulations make explicit that "the term 'discretion and independent judgment' does not require

---

[4] Levy also argues that any discretion he exercised was not related to matters of significance because others in Remy performed similar work. However, "[t]he fact that many employees perform identical work or work of the same relative importance does not mean that the work of each such employee does not involve the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(d).

that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." 29 C.F.R § 541.202(c) ("The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment."). Again, *Viola* is instructive.

There, the Court found as a matter of law that the plaintiff exercised sufficient discretion notwithstanding that she was required to submit most of her plans to management before they were finalized. *Viola v. Comprehensive Health Mgmt., Inc.*, 441 F. App'x 660, 664 (11th Cir. Sept. 26, 2011). The Court found it sufficient that she usually worked alone and generally without supervision, chose where and to whom to promote her employer's product, chose where to hold promotional events and negotiated the cost of those events. *Id.* at 662–64. Additionally, the Court noted that the plaintiff was the only employee in her region, had no set hours and was not required to keep track of her hours. *Id.* at 662.

The facts here are strikingly similar. Though Levy regularly sought approval from de Launay, he chose which accounts to target, recommended where and how to meet and educate high net worth individuals and recommended how to work within, and sometimes beyond, Remy's event experience guidelines. *Id.* at 663–64 (noting that the employee's discretion in promoting her employer's product was limited by complex federal regulations). As Remy's sole representative on the ground, he had special knowledge of his market, and his recommendations were influential. Additionally, as in *Viola*, his direct supervisor did not work in his region; de Launay worked in New York while Levy worked in Florida, Georgia, Alabama, Louisiana,

Texas, Tennessee and Colorado.[5] And Levy was free to work at his discretion. In sum, the record makes clear that there is no genuine issue as to whether Levy, who was paid over $100,000 per year, exercised discretion and independent judgment with respect to matters of significance in carrying out his primary duty. *See* 29 C.F.R. § 541.601 ("A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."). Accordingly, Levy's past employment is exempt from the overtime provision of the FLSA under the administrative employee exemption.

But alternatively, even assuming *arguendo* that Levy's primary duty did not include the exercise of discretion with respect to matters of significance, his past employment is nonetheless exempted because Levy was a highly compensated employee. Under Department of Labor regulations, an employee whose primary duty does not involve the exercise of discretion nonetheless qualifies as an administrative employee whose employment is exempt from the overtime provision of the FLSA if: (1) the employee's primary duty involves "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (2) the employee earns at least $100,000 annually. 29 C.F.R. § 541.601(a) and (c); *see also Amendola v. Bristol-Myers Squibb Co.*, 558 F.Supp.2d 459, 478 (S.D.N.Y. 2008); *Coppage v. Bradshaw*, 665 F.Supp.2d 1361, 1369 (N.D. Ga. 2009).

Levy's annualized salary was $90,000 from January 17, 2012, to June 30, 2013, and was $91,800 from July 1, 2013, until December 11, 2013. Thus, considering Levy's bonuses of

---

[5] Though Levy relies heavily on email correspondences, which purportedly show that he was supervised closely by de Launay via email, the undisputed evidence, including those emails, shows that Levy was permitted to exercise considerable discretion as to matters of significance.

$3,223 for work done from January 17, 2012, to March 31, 2012, and $13,748 for work from April 1, 2012, to March 31, 2013, Levy's total annual compensation exceeded $100,000 for every 52-week period of his employment. Levy Dep.[6]

Levy argues that his annual bonuses should be disregarded because they were discretionary. Indeed, for purposes of determining whether an employee qualifies as a "highly compensated employee," only nondiscretionary bonuses may be considered. 29 C.F.R. § 541.601 ("Total annual compensation may ... include [salary,] commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52–week period."). However, the Department of Labor's formulation of what constitutes a "discretionary bonus" is more limited than what Levy advocates.

To qualify as a discretionary bonus under the relevant regulations, it is not enough that the employer retain discretion as to the fact and amount of payment. Under the regulations, any bonus paid pursuant to some prior agreement or promise, as well as any bonus announced to induce improved employee performance or continued employment, is considered nondiscretionary. 29 C.F.R. § 778.211(c).[7] Thus, any bonus contingent on work attendance or work quality, or contingent on the employee's being employed at the time of payment, is considered nondiscretionary. *Id.*; *see also Abbey v. United States*, 99 Fed. Cl. 430, 451 (Fed. Cl. 2011) (finding that a bonus was not discretionary because it was contingent on the employee's

---

[6] "The employer may utilize any 52–week period as the year, such as a calendar year, a fiscal year, or an anniversary of hire year." 29 C.F.R. § 541.601(b)(4).

[7] While this provision defines "discretionary bonuses" for the purpose of regulating which bonuses constitute part of an employee's annual salary, the provisions of a single regulatory scheme should be interpreted harmoniously. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631 (1973).

completing a specific period of employment); Chavez v. City of Albuquerque, 630 F.3d 1300, 1308 (10th Cir. 2011) (finding that sick leave buy-backs rewards employees for consistent, as-scheduled attendance, and as such are analogous to nondiscretionary attendance bonuses); *Acton v. City of Columbia, Mo.,* 436 F.3d 969 (8th Cir. 2006) (same).

Here, even assuming *arguendo* that Remy reserved discretion as to whether to pay Levy any bonus, Levy's bonuses nonetheless constitute nondiscretionary bonuses insofar as they were announced to induce Levy's continued employment with Remy and to induce improved employee performance. Federal law makes explicit that such bonuses are nondiscretionary. 29 C.F.R. § 778.211(c); *see also Dietrick v. Securitas Sec. Servs. USA, Inc.*, No. 13-CV-05016-JST, 2014 WL 2880218, at *7 (N.D. Cal. June 23, 2014) ("The payments at issue constitute non-discretionary bonuses under 29 C.F.R. § 778.211(c) because they incentivize employees to continue their employment ... until ... the payment is made."). Accordingly, because there is no genuine issue that Levy was a highly compensated employee within the meaning of the regulations, his past employment is exempt from the overtime provision of the FLSA under the administrative employee exemption regardless of whether his primary duty involved the exercise of discretion and independent judgment with respect to matters of significance.

## CONCLUSION

In accordance with the foregoing, it is hereby

ORDERED AND ADJUDGED that Remy's Motion for Summary Judgment, (D.E. 28), is GRANTED, and Levy's Motion for Partial Summary Judgment, (D.E. 34), is DENIED. Summary Judgment is hereby GRANTED in favor of Remy and against Levy.

DONE AND ORDERED in Chambers in Miami, Florida this 5th day of November, 2014.

_____
UNITED STATES DISTRICT JUDGE

cc:
counsel of record via cm/ecf